UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

OLIVET UNIVERSITY,

    Plaintiff,

v.                                 CASE NO. 8:24-cv-771-SDM-LSG

ALEX ROUHANDEH,

    Defendant.
_____/

## **ORDER**

    Asserting a claim for defamation *per se* (Count I) and a claim for tortious interference (Count II), Olivet University sues (Doc. 29) journalist Alex Rouhandeh, a writer for *Newsweek*. Rouhandeh moves (Doc. 31) to dismiss the complaint for failure to state a claim. Olivet responds (Doc. 36) in opposition. In the motion, Rouhandeh argues (1) that California law controls this action and California's limitation bars several of Olivet's allegations, (2) that the complaint fails to specify each allegedly defamatory statement, (3) that res judicata based on Olivet's plea of guilty to misdemeanor conspiracy to commit money laundering bars Olivet's allegation, and (4) that Florida's "single-action rule" bars Olivet's tortious interference claim.

## BACKGROUND: OLIVET'S ALLEGATIONS[1]

Founded in Southern California, Olivet is a private "evangelical Christian" university with a main campus in Anza, California, and with a satellite campus in Florida, in Missouri, in Tennessee, and in the District of Columbia. In 2000, Korean-American Pastor David Jang established Olivet as a seminary, but Olivet now offers other degrees. Although the complaint fails to reveal specifics, Olivet through a separate entity controlled part or all of Newsweek. At an unspecified time, Newsweek separated from Olivet, and Dev Pragad, a former "Olivet member," obtained a fifty-percent ownership in Newsweek.

In 2018, the New York County District Attorney investigated Olivet's "financing of certain computer servers," and a grand jury indicted Olivet, Olivet's Trustee William Anderson, Olivet's Dean and Finance Director Lingyi Xiao, and Olivet's Chairman of the Board of Trustees Andrew Lin on sixteen counts for a "sham financing scheme." *Olivet Univ. v. Newsweek Digital LLC*, 2024 WL 1892563, at *1 (S.D.N.Y. Apr. 30, 2024). The indictment charged Olivet with one count of money laundering. In February 2020, Olivet pleaded guilty to one count of felony "falsification of business records" and one count of misdemeanor "conspiracy . . . with intent" to commit "a class C felony . . . , Money Laundering in the Second

---

[1] This order accepts as true each well-pleaded "allegation[] in the complaint" and "construe[s]" each allegation "in the light most favorable" to the Olivet. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016).

Degree . . . ." *Olivet Univ.*, 2024 WL 1892563, at *2 (quoting the indictment at 9). Anderson pleaded guilty to felony "money laundering in the second degree."

In early 2022, Pragad, several Newsweek employees, and Rouhandeh launched an "attack campaign" against Olivet. Between June 27, 2022, and May 28, 2024, Rouhandeh authored, and Newsweek published, fifteen articles — each of which associated Olivet with criminal activity. On March 23, 2023, Rouhendah wrote, and Newsweek published, the article (the 2023 article) *California Moves to Shut Down David Jang's Olivet University as Feds Circle*. (Doc. 29–1) The 2023 article states (1) "that Olivet pled guilty to money laundering," (2) "that Olivet is currently under investigation for human or labor trafficking," (3) that Olivet is involved in "drug trafficking," and (4) that Olivet is associated with "criminal" or "other" investigations. (Doc. 29 at 16) The 2023 article was published on Newsweek's website.

Olivet relies on state and private educational accreditation. To disrupt Olivet's accreditations, Rouhandeh "disseminate[d]" allegedly defamatory articles to the Bureau of Private Postsecondary Education in California, the Association of Biblical Higher Education, and state education accreditors in New York, Tennessee, Florida, and the District of Columbia. In an attempt to alienate each organization from Olivet, Rouhandeh sent to the World Evangelical Alliance and the National Association of Evangelicals *Newsweek* articles alleging criminal conduct. Also, Rouhendah sent allegedly defamatory articles to "at least two congresspeople" and "funded a lobbyist firm" to instigate a DOJ investigation of Olivet.

On September 18, 2023, in the Southern District of New York, Olivet sued Rouhandeh, Newsweek, and Rouhandeh's co-author Naveed Jamali. *Olivet Univ.*, 2024 WL 1892563, at *1 (S.D.N.Y. Apr. 30, 2024). Olivet asserted a claim for defamation based on two *Newsweek* articles (including the 2023 article). In the New York action, Olivet alleged that each article stated that "Olivet pleaded guilty to a money laundering charge when, in reality, it only pleaded guilty to (1) falsification of business records in the first degree and (2) conspiracy in the fifth degree." *Olivet Univ.*, 2024 WL 1892563, at *4. Rouhandeh argued that the Southern District of New York lacked personal jurisdiction because Rouhandeh resides in Florida. Olivet moved to voluntarily dismiss without prejudice the claim against Rouhaneh. (Doc. 29 at 1 n.1)

The remaining defendants moved to dismiss Olivet's defamation claim. Finding that Newsweek's statement that Olivet pleaded guilty to money laundering was "substantially true," the district judge held as a matter of New York law that each article failed to constitute defamation. *Olivet Univ.*, 2024 WL 1892563, at *5. The district judge dismissed with prejudice Olivet's defamation claim, and Olivet appealed. Finding that under New York law the alleged statement is "substantially true" and that the statement is covered by New York's "fair report privilege," the Second Circuit affirmed. *Olivet Univ. v. Newsweek Digital LLC*, 2024 WL 5001841, at *4 (2d Cir. Dec. 6, 2024).

## DISCUSSION

### I. CHOICE OF LAW

Rouhandeh argues that under Florida's choice-of-law rule California law governs this action and that California's one-year limitation for defamation bars several of Olivet's claims.[2] Olivet contends that Florida law, including Florida's two-year limitation, controls this action.[3] In a state tort action, the law of the forum state controls the choice of law, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), and the *Second Restatement*'s "most-significant-relationship test" determines which state's law controls the action, *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980) (quoting *Restatement (Second) of Conflict of Laws* §§ 145 (1971)). Determination of the "most significant relationship" requires analysis of (1) the place of injury, (2) the place of the conduct that caused the injury, (3) the domicile of each party, and (4) the place where the parties' relationship is centered.[4] *Bishop*, 389 So. 2d at 1001 (citing *Restatement (Second)* § 145). "These factors are considered 'according to their relative importance with respect to the particular issue'" and in relation to each

---

[2] Section 95.10, Florida Statutes—Florida's "borrowing statute"—requires that "[w]hen the cause of action arose in another state . . . and [that state's] laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state."

[3] Section 95.11(5)(h), Florida Statutes.

[4] Under Section 145, *Restatement (Second)*, analysis of the four factors is conducted "in light of" the principles in Section 6, *Restatement (Second)*: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."

state's "interest." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) (quoting *Bishop*, 389 So.2d at 1001)).

First, the place of injury is not concentrated in one state. Because "[t]he allegedly defamatory information was published online and accessible anywhere," *Nix v. ESPN, Inc.*, 772 F. App'x 807, 810 (11th Cir. 2019), the place of injury evades precise location. Although Olivet's principal place of business is California, Olivet maintains a campus in Florida, in Missouri, in Tennessee, and in the District of Colombia. (Doc. 29 at 5) At least part of the damage to Olivet's reputation occurred at each campus. Additionally, part of Olivet's injury occurred in New York, where the state investigated and prosecuted Olivet. The "place-of-injury" factor is neutral.

Second, the injurious conduct occurred primarily in Florida where Rouhandeh wrote each allegedly defamatory article and, to a lesser degree, in New York where Newsweek decided to publish each article.[5] The "place-of-conduct" factor slightly favors Florida.

Third, Olivet's domicile is California, and Rouhandeh's domicile is Florida. Olivet, however, maintains a presence in several states, and Rouhandeh lives and works in Florida. The "place-of-domicile" factor weighs in favor of Florida.

---

[5] Rouhandeh contends that, in the event California law fails to control, New York law should apply. (Doc. 31 at 13 n. 3) Olivet argues that applying New York law is unfair because in the New York action Rouhandeh specifically argued that the state of New York lacked personal jurisdiction over Rouhandeh. (Doc. 36 at 14) If New York lacks personal jurisdiction over Rouhandeh, New York necessarily fails to maintain the "most significant relationship" to an action predicated on the conduct of Rouhandeh.

- 6 -

Fourth, Olivet and Rouhandeh maintain no business relation beyond Rouhandeh's reporting and this action.[6] The "center-of-relationship" factor is neutral.

Finally, neither California nor Florida's underlying "interest" is affected by the application of a one-year or two-year limitation. California's "interest" underlying the one-year defamation-action limitation is to protect California defendants from prolonged exposure to defamation claims in California. No California defendants appear in this action. Florida's underlying "interest" is to ensure that Florida defendants are exposed to defamation claims for no more than two years. Florida's "interest" is neither benefited nor hindered by applying a one-year limitation. Because California's "interest" is not at issue and Florida's "interest" is unaffected by the application of either limitation, the factor of each state's underlying "interest" is neutral.

Because two factors favor Florida law over California law, Florida law controls this action. Florida's two-year limitation applies to Olivet's defamation claim.

## II. THE PRECLUSIVE EFFECT OF THE NEW YORK ACTION

Rouhandeh argues that to the extent Olivet's claim for defamation depends on statements included in the New York action, the preclusive effect of the New York decision bars Olivet's claim in this action. Specifically, Rouhandeh contends that the

---

[6] Although Newsweek, Pragad, and Olivet have a long and fraught relation, the complaint states no facts showing a relation between Rouhandeh and Olivet beyond Rouhandeh's arm's length reporting.

- 7 -

"doctrine of *res judicata*" bars Olivet from "relitigating" a claim based on the statement that Olivet pleaded guilty to money laundering. (Doc. 31 at 15)

In a diversity-of-citizenship action, state law controls the application of *res judicata*. *CSX Transportation, Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1340 (11th Cir. 2017). "The doctrine of *res judicata* provides that a judgment on the merits in an earlier suit bars a later suit on the same cause of action between the same parties or others in privity with those parties." *Provident Funding Assocs., L.P. v. MDTR*, 257 So. 3d 1114, 1117 (Fla. 2d DCA 2018). "To be in privity with a party to an earlier lawsuit," Rouhandeh "must have an interest in the [earlier] action such that [Rouhandeh] will be bound by the final judgment as if [Rouhandeh] were a party.'" *Provident Funding*, 257 So. 3d at 1118 (quoting *Pearce v. Sandler*, 219 So.3d 961, 965 (Fla. 3d DCA 2017)); *Pickell v. Lennar Homes, LLC*, 372 So. 3d 1279, 1281 (Fla. 6th DCA 2023) ("[Privity] can arise in cases such as those involving insurance companies and insureds . . . or in the context of assignees or successors in interest."); *AMEC Civ., LLC v. PTG Const. Servs. Co.*, 106 So. 3d 455, 456 (Fla. 1st DCA 2012) (finding privity for third-party with an indemnity obligation to a party in the earlier judgment).[7]

Rouhandeh "could not have been bound by the outcome" of the New York action. *Stogniew v. McQueen*, 656 So. 2d 917, 920 (Fla. 1995). The New York action resulted in no judgment — or any other adjudication — against Rouhandeh, whom

---

[7] Like res judicata, issue preclusion (also know as collateral estoppel) requires "identical" parties or a third-party that is in privity to an original party in the earlier action. *Pearce v. Sandler*, 219 So. 3d 961, 965 (Fla. 3d DCA 2017).

the district judge dismissed from the action. Because Rouhandeh and Newsweek are not in privity, neither the "doctrine of *res judicata*" nor the "doctrine of issue preclusion" bars Olivet's defamation claim based on the statement about Olivet's guilty plea. Rouhandeh has no "interest in the [New York action] such that [Rouhandeh] will be bound by the final judgment as if [Rouhandeh] were a party." *Pearce*, 219 So. 3d at 965.

Like New York, Florida adheres to the "substantial truth doctrine" in defamation actions. *Kieffer v. Atheists of Fla., Inc.*, 269 So. 3d 656, 659 (Fla. 2d DCA 2019). Under common law defamation, only false statements are actionable. *Jews For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). "[F]alsity only exists if the publication is substantially and materially false, not just if [the publication] is technically false." *Kieffer*, 269 So. 3d at 659 (quoting *Smith v. Cuban Am. Nat'l Found.*, 731 So.2d 702, 707 (Fla. 3d DCA 1999)). "Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." *Kieffer*, 269 So. 3d at 659 (quotations omitted).

If a statement "is ambiguous and reasonably susceptible of a defamatory meaning, it is for the trier of fact to decide whether the communication was understood in the defamatory sense." *Kieffer*, 269 So. 3d at 659 (quoting *Perry v. Cosgrove*, 464 So. 2d 664, 666 (Fla. Dist. Ct. App. 1985)); *Pep Boys v. New World Commc'ns of Tampa, Inc.*, 711 So. 2d 1325, 1328 (Fla. Dist. Ct. App. 1998). Whether Rouhandeh's statement that Olivet "pleaded guilty in 2020 to a money laundering charge brought by the Manhattan District Attorney" is substantially true is likely a question

for a jury. Because a jury could find that the statement is not substantially true, Olivet states a claim for defamation based on the statement that Olivet pleaded guilty to money laundering.

### III. OLIVET'S CLAIMS

#### A. Defamation *Per Se* Claim

To succeed on a defamation claim, a plaintiff must establish "(1) publication; (2) falsity; (3) . . . knowledge or reckless disregard as to the falsity . . . ; (4) actual damages; and (5) [that] the statement [is] defamatory." *Jews for Jesus*, 997 So. 2d at 1106. "*Per se* defamatory statements are 'so obviously defamatory' and 'damaging to reputation' that they 'give[ ] rise to an absolute presumption both of malice and damage.'" *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015) (quoting *Wolfson v. Kirk*, 273 So.2d 774, 776 (Fla. 4th DCA 1973)). "[C]onsidered alone and without innuendo," a written publication constitutes libel *per se* if the statement "(1) [declares] that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession." *Alan*, 604 F. App'x at 865. In Florida, "infamous crime" means a felony.[8] *Klayman v. Jud. Watch, Inc.*, 22 F. Supp. 3d 1240, 1247 & n.3 (S.D. Fla. 2014).

---

[8] *Black's Law Dictionary* defines "felony" as "[a] serious crime usu[ally] punishable by imprisonment for more than one year or by death." *Black's Law Dictionary* (12th ed. 2024).

- 10 -

Under Section 770.01, Florida Statutes, before a plaintiff sues a "news media" defendant, the plaintiff must give pre-suit notice to the author.[9] *Rendon v. Bloomberg, L.P.*, 403 F. Supp. 3d 1269, 1275–76 (S.D. Fla. 2019). In an action against a reporter, a plaintiff who gives notice to the publishing corporation and not to the individual reporter fails to satisfy Section 770.01. *Rendon*, 403 F. Supp. 3d at 1275–76. Absent pre-suit notice, dismissal is proper. *Rendon*, 403 F. Supp. 3d at 1275–76; *Mancini v. Personalized Air Conditioning & Heating, Inc.*, 702 So. 2d 1376, 1377 (Fla. 4th DCA 1997).[10]

A complaint must "generally allege[] compliance" with the "condition[] precedent" of notice under Section 770.01. *Bayliss v. Cox Radio, Inc.*, 2010 WL 4023459, at *3 (M.D. Fla. Oct. 13, 2010) (Whittemore, J.). The complaint states that "On January 30, 2024, pursuant to Fla. Stat. § 770.01, counsel for Olivet again served notice on counsel for Rouhandeh regarding the 2023 article, informing counsel that Olivet planned to refile its suit based on the defamatory statement in the 2023 Article." (Doc. 29 at 13) In the complaint, Olivet sufficiently pleads notice for the statements in the 2023 article.

---

[9] Section 770.01 states, "Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory." Fla. Stat. § 770.01.

[10] If time remains under the statute of limitation, failure to satisfy Section 770.01 warrants dismissal without prejudice. *Bayliss v. Cox Radio, Inc.*, 2010 WL 4023459, at *4 (M.D. Fla. Oct. 13, 2010) (Whittemore, J.); *City of Coconut Creek v. City of Deerfield Beach*, 840 So.2d 389, 393 (Fla. 4th DCA 2003).

The complaint attaches a 2022 pre-suit letter, which Olivet sent to Newsweek. (Doc. 29-2)  The letter alerts Newsweek to defamatory statements in three 2022 publications.  Because Olivet never sent the 2022 letter to Rouhandeh, the 2022 letter fails to satisfy Section 770.01.  *See Rendon*, 403 F. Supp. 3d at 1275–76.  Although not entirely clear, the complaint alleges that statements not included in the 2023 article are actionable as defamation *per se*.  To the extent that Olivet sues for a defamatory statement not included in the 2023 article, Section 770.01 requires the dismissal of each statement for failure to provide Rouhandeh with pre-suit notice.

Count I includes three additional allegedly defamatory statements.  First, Rouhandeh wrote that "Olivet is currently under investigation for human or labor trafficking."  The 2023 Article states, "The Department of Homeland Security . . . is also looking at whether [Olivet] trafficked labor and broke visa laws with regard to the students on its campus, many of whom come from China."  (Doc. 29-1 at 3)  Labor trafficking is a felony under both California and federal law.[11]  Olivet states a claim for defamation *per se* based on the statement that Olivet participated in labor trafficking.

Second, Olivet alleges that the 2023 article "associate[ed] Olivet with drug trafficking."  A search of the 2023 article reveals no statement that "associates"

---

[11] Cal. Penal Code § 236.1 ("A person who deprives or violates the personal liberty of another with the intent to obtain forced labor or services, is guilty of human trafficking and shall be punished by imprisonment in the state prison for 5, 8, or 12 years and a fine of not more than five hundred thousand dollars."); 18 U.S.C.A. § 1589 (indicating that a person who "knowingly provides or obtains the labor or services of a person" by force or threat "shall be . . . imprisoned not more than 20 years").

Olivet with, or otherwise mentions, drug distribution or trafficking. Olivet's allegation that Rouhandeh defamed Olivet with a statement "that associate[s] Olivet with drug trafficking" warrants dismissal.

Third, Olivet alleges that the 2023 article "associate[ed] Olivet with numerous other . . . criminal or [civil] investigation[s]." The complaint offers no further details about the "numerous other" investigations. "Without more," Rouhandeh's statement "lacks sufficient detail for a reader to conclude the crime involved is a felony." *Klayman*, 22 F. Supp. 3d at 1248. Because the statement must allege that Olivet committed a felony and because the complaint never specifies the felony, the complaint fails to state a claim for defamation *per se* based on the statement about "numerous other" investigations.

### B. Tortious Interference Claim

The elements of a claim for tortious interference are "(1) the existence of a business relationship . . . under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Klayman*, 22 F. Supp. 3d at 1255 (quotations omitted). Olivet fails to identify the specific business relations with which Rouhandeh interfered. Interference with Olivet's relation with the public at large is insufficient. *Ozyesilpinar v. Reach PLC*, 365 So. 3d 453, 461 (Fla. 3d DCA 2023). "As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement" that Rouhandeh's

interference disrupted. *Ozyesilpinar*, 365 So. 3d at 460. Also, the complaint fails to show how Rouhandeh's wrongful inference damaged Olivet.

Olivet fails to specify which defamatory statements caused the interference. Although Olivet alleges that "Rouhandeh intentionally interfered with Olivet's business relationships by sending defamatory articles to its business partners," the complaint never identifies which defamatory statement Rouhandeh used to tortiously interfere. Florida's pre-suit notice statute applies to a tortious interference claim based on an allegedly defamatory statement. *Skupin v. Hemisphere Media Grp., Inc.*, 314 So. 3d 353, 357 (Fla. 3d DCA 2020). Because Olivet failed to notify Rouhandeh which statements caused the interference, the complaint fails to properly plead pre-suit notice.

Rouhandeh argues that Florida's "single-action rule" bars Olivet's tortious interference claim. "In Florida, a single publication gives rise to a single cause of action." *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So.2d 204, 208 (Fla. 4th DCA 2002) (citation omitted). "When claims are based on analogous underlying facts and the causes of action are intended to compensate for the same alleged harm, a plaintiff may not proceed on multiple counts for what is essentially the same defamatory publication or event." *Klayman*, 22 F. Supp. 3d at 1256 (finding that the rule requires dismissal for "concurrent counts . . . based on the same publication and [the same] underlying facts as the failed defamation count"). Because the complaint fails to specify which defamatory statement caused the interference, consideration of the "single-action rule" is premature.

- 14 -

Olivet fails to state a claim for tortious interference. Count II warrants dismissal.

## CONCLUSION

For the reasons stated above, the motion (Doc. 31) is **GRANTED-IN-PART**. Each allegedly defamatory statement — except the statement alleging that Olivet pleaded guilty to money laundering and the statement that Olivet is under investigation for labor trafficking — is **DISMISSED WITHOUT PREJUDICE**. Count II is **DISMISSED WITHOUT PREJUDICE**. No later than **FEBRUARY 21, 2025**, Olivet may amend the complaint. Any amended complaint must clearly and specifically state which allegedly defamatory statement supports a claim of defamation, and any amended claim for tortious interference must rely on factual allegations that are distinct from the factual allegations that support a claim for defamation.

ORDERED in Tampa, Florida, on January 13, 2025.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE